# NO. 12-13-00136-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *ROBERT LYNN PRIDGEN,*<br>*APPELLANT* | § | *APPEAL FROM THE 3RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *ANDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Robert Lynn Pridgen appeals his conviction for murder. He raises three issues on appeal. We affirm.

### BACKGROUND

An Anderson County grand jury indicted Appellant for the murder of Paul Rohne alleged to have occurred on or about January 27, 2009. It is undisputed that Appellant fired the shot that led to Rohne's death, but he contends that he was acting in self-defense.

Appellant pleaded "not guilty," and his first trial resulted in a hung jury. In his second trial, the jury rejected Appellant's claim of self-defense, found him guilty, and assessed punishment at twenty years of imprisonment. This appeal followed.

### SUFFICIENCY OF THE EVIDENCE

In his first two issues, Appellant contends that the evidence is legally and factually sufficient to support his "affirmative defense of self-defense." Appellant contends that he is entitled to an acquittal because the evidence established his "affirmative claim of self-defense . . . as a matter of law."

**Standard of Review**

Appellant contends that the standard of review in this case is governed by the holding in *Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013), but his reliance on *Matlock* is misplaced. In *Matlock*, the court of criminal appeals reaffirmed that the civil standards of review apply when an appellant raises a legal or factual sufficiency challenge to a jury's adverse finding on his affirmative defense. *See Matlock v. State*, 392 S.W.3d 662, 668–70 (Tex. Crim. App. 2013). This is because, in a criminal case, a defendant must prove an affirmative defense by a preponderance of the evidence—the civil burden. *See id.*

Under *Matlock*, the standard for reviewing the legal sufficiency of the evidence supporting an adverse finding on an affirmative defense is as follows:

> When an appellant asserts that there is no evidence to support an adverse finding on which [he] had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the finding, disregarding all contrary evidence *unless a reasonable fact[]finder could not*. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*See id.* at 669 (citations omitted). When examining whether an appellant established his factual sufficiency claim, the appellate court views the entirety of the evidence in a neutral light, and may sustain a factual sufficiency challenge on appeal

> only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.

*See id.* at 671 (citing *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990) (en banc)). However, the standards set forth in *Matlock* do not apply to the current case because self-defense is a defense rather than an affirmative defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

The issue of self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991) (en banc). In reviewing the sufficiency of the evidence to support the jury's rejection of self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have

found the essential elements of the offense and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *See id.* at 914 (stating "we look not to whether the [s]tate presented evidence which refuted appellant's self-defense"); *Sutton v. State*, No. 12-04-00150-CR, 2005 WL 3725087, at *3 (Tex. App.—Tyler 2006, pet. ref'd) (mem. op., not designated for publication). Under this standard, we do not conduct a separate factual sufficiency review. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Accordingly, we address Appellant's second issue (legal sufficiency) but not his first (factual sufficiency). *See* TEX. R. APP. P. 47.1.

**Applicable Law**

The use of deadly force is justified as self-defense under certain circumstances. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). An actor is justified in using deadly force against another if (1) the actor would be justified in using force under Section 9.31 of the penal code, and (2) when and to the degree the actor reasonably believes that deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force, or to prevent the other's imminent commission of murder, sexual assault, or aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 9.32(a) (West 2011).

Self-defense is an issue to be determined by the jury. *Saxton*, 804 S.W.2d at 913. "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.* at 914.

When a defendant raises self-defense, he bears the burden of producing some evidence to support his defense. *See Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913); *see also McCurdy v. State*, No. 06-12-00206-CR, 2013 WL 5433478, at *3 (Tex. App.—Texarkana Sept. 26, 2013, pet. ref'd) (mem. op., not designated for publication). Once the defendant produces some evidence supporting his defense, the state then bears the burden of persuasion to "disprove the raised defense." *Zuliani*, 97 S.W.3d at 594; *see also Tidmore v. State*, 976 S.W.2d 724, 729 (Tex. App.—Tyler 1998, pet. ref'd) (state does not have burden of producing evidence to affirmatively refute self-defense). The burden of persuasion does not require the production of evidence; it requires only that the state prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594.

**The Evidence**

It is undisputed that Appellant shot and killed Paul Rohne. Appellant called 911 at approximately 1:25 a.m. on January 27, 2009. The following discourse took place between Appellant and the 911 dispatcher:

Dispatch: Anderson County 911.

Appellant: Yeah, how you doin' tonight?

Dispatcher: Sir, do you have an emergency?

Appellant: Yeah I do, I got a dead man on my couch. Um.

Dispatcher: You have a dead man on your couch?

Appellant: Yeah, I just shot him.

Dispatcher: You shot him?

Appellant: Yes I did.

Dispatcher: What's your name sir?

Appellant: Lynn Pridgen.

Dispatcher: And who is the man you shot?

Appellant: Uh, Paul Rohne.

Dispatcher: And why did you shoot him?

Appellant: Uh, because he was attacking me. But, you know, all this stuff needs to be hashed out in court. But I'm telling you I got a dead man on my couch and I'd like a[n] ambulance or something to come get him.

Dispatcher: Okay, hold on for me just a second sir, okay?

Appellant: Yeah.

At approximately 1:30 a.m., law enforcement arrived at the residence. By that time, Appellant's 911 call had ended. The 911 dispatcher called Appellant back and informed him that law enforcement was requesting that he exit his residence. In concluding this phone call with the dispatcher, Appellant said, "Cool deal[.] You're doin' good girl. Bye."

Sergeant Ronnie Foster was among the first officers to enter the residence. He testified that there did not appear to be any signs of struggle, that the temperature inside the residence was

4

68 degrees, and that Rohne was deceased. Rohne was sitting on a loveseat, slumped over, with his ankles crossed. He had a "tight" grip on the side of his glasses with his left hand and "no grip at all" on a knife that was in his right hand.

Deputy Michael Mitchell arrived at Appellant's residence at the same time as Sergeant Foster. When they arrived, they handcuffed Appellant, and placed him in Mitchell's patrol car. Mitchell testified that Appellant had difficulty standing, his speech was slurred, and he smelled heavily of alcohol. He testified that Appellant was intoxicated, which Appellant confirmed when he testified that he was "drunk" the night of the shooting.

Paramedic Matthew Corbin arrived at Appellant's residence at approximately 1:50 a.m. Corbin confirmed that Rohne was dead and testified that he was cool to the touch, and his skin was pale and mottled.[1] Corbin testified that a large amount of blood was "all over the place," and that blood was "already coagulating" when he arrived.

The officers collected various items from the scene, including the knife in Rohne's right hand and a shotgun that they believed was used in the shooting. They swabbed the knife and shotgun for forensic testing. The trigger of the shotgun contained Appellant's DNA, but no DNA profiles could be extracted from the knife. No usable fingerprints were obtained from the gun or the knife.

### Cause and Time of Rohne's Death

Dr. Delbert Van Deusen, a forensic pathologist, performed an autopsy and determined that Rohne's cause of death was a shotgun wound to the chest. He testified that Rohne had a blood alcohol concentration of .33, "a rather obvious bruise on the . . . right side of his face[,] multiple bruises on his arms, a pretibial area on his legs[, and] of course, the shotgun wound to the chest." The bruising occurred prior to Rohne's death, Dr. Van Deusen explained, because bruising requires blood pressure. When Rohne was shot, he instantly lost blood pressure because the gunshot went through his heart. Dr. Van Deusen described the bruising on Rohne's arms as "defense wounds" because their pattern indicated that they were incurred from a person attempting to protect his face or body. He agreed that an equally consistent explanation for the cause of Rohne's bruising was falling.

Dr. Van Deusen testified that Rohne's gunshot wound was front to back, downward, and slightly left to right. He described the wound as "more of a distant gunshot wound." He

---

[1] Corbin explained that "mottled" meant Rohne's skin appeared, pale, white, and blotchy.

explained that the firearm was discharged approximately eight to ten feet away and was positioned higher than Rohne when it was discharged. Dr. Van Deusen did not know how long Rohne had been dead when the photographs of Rohne (specifically State's exhibits 10, 48, and 51) were taken. Hypothetically, he estimated that if there was some mottling of the skin, the body was cool to the touch, and there was coagulation of blood, a person could have been dead for "two or three hours."[2]

Dr. Van Deusen explained the differences between liver mortis and rigor mortis because the testimony had shown that some of the officers believed Rohne's loose grip on the knife was due to the fact that the knife was staged. Sergeant Foster testified that he expected Rohne to have a "death grip" on the knife. Investigator Larry Warrick testified that he thought the positioning of the knife was odd because Rohne's hand was "cupping" the knife instead of holding it, and the knife fell out of Rohne's hand after Warrick barely touched it.

Dr. Van Deusen testified that there was not anything significant about Rohne's left hand having a stronger grip on his glasses and his right hand being more loose and open around the knife. He was asked, "You can't say whether [Appellant's fingers were] like that and opened up, or whether it was closed, or whether it was never closed, or—I mean, either hand?" Dr. Van Deusen replied, "I wouldn't even speculate."

*Appellant's Testimony*

Appellant is a retired, fifty-nine-year-old man. He is five feet, eight inches tall, weighs 180 pounds, and has chronic obstructive pulmonary disease (COPD). He has worked as a security officer, and as a sergeant and maintenance employee for the Texas prison system. Appellant met Rohne sometime before 2001, and Appellant began renting part of his house to Rohne approximately seven months before the shooting.[3]

Appellant testified that he originally did not want to rent his house, but after several months of being "begged" by Rohne and Rohne's ex-wife, he finally agreed. Appellant testified, "[B]oth he [(Rohne)] and Carla [(Rohne's ex-wife)] stated [']If I keep living up here,['] – or, Carla would say [']If he keeps living up there in Tyler, he's going to kill somebody.[']" Because Appellant occasionally needed the use of his Bois D' Arc house, his agreement with Rohne was

---

[2] State's exhibits 10, 48, and 51 are photographs of Rhone from different angles as he was found at Appellant's residence. The record is silent as to the time the photographs were taken.

[3] Appellant's primary residence is in Neches, Texas. The house where the shooting occurred is located in Bois D'Arc, a community near Montalba.

that he would continue to have use of the master bedroom and bathroom, he could stay at the house whenever he desired, and Rohne was to have use of the rest of the house.

Appellant described Rohne as a much younger, very large man—over six feet tall and weighing about 270 pounds. Rohne was one of Appellant's "drinking buddies." Appellant testified that Rohne generally had a mellow demeanor when he was drinking but sometimes became depressed and talked about killing himself. Rohne and Appellant never had any disagreements, fights, or arguments prior to January 26, 2009.

Appellant and Rohne talked on the phone almost every night. Appellant testified that he was sure he and Rohne had talked about their "escapades of the past a couple of weeks" before the shooting. But it was not until the week before the shooting that Rohne told Appellant that he hired prostitutes in Dallas to handcuff and leg iron him to a bed.

On January 26, 2009, at approximately 4:00 p.m., Appellant arrived at his Bois D' Arc house. Once he arrived, he and Rohne began drinking alcohol. During the night, Appellant inquired about Rohne's experience with the Dallas prostitutes. Because Rohne had not responded to his previous questions, Appellant continued to prod Rohne for details and stated, "Come on, Paul, tell me what those whores did to you." Rohne responded, "Oh, you'd be surprised." Later that night, Rohne commented on Appellant's interest about the Dallas prostitutes and said, "Lynn, you seem to show a lot of interest in that. You ought to try it sometime."

Sometime after 10:00 p.m., Appellant fell asleep on the loveseat and was awakened by Rohne "rubbing my genitals" with his left hand. Rohne told Appellant, "Don't get up. Just relax and enjoy the pleasure." Approximately one second after Rohne's statement, Appellant "jumped up," and ran to the sliding glass door, but the door was locked. When Appellant turned and looked back at Rohne, he saw that Rohne had a knife in his hand and "was getting up, and coming towards me." When he saw Rohne standing with the knife, Appellant "thought something bad was fixing to happen" to him. Appellant explained that he felt that he had been sexually assaulted, and the thought running through his mind was that Rohne "was going to rape me, handcuff me up to a bed. He was just running fast." Appellant shot Rohne as he was "in the process of standing up," and testified that he shot Rohne because "I was in fear of my life. I thought he was going to kill me." Appellant testified that one of the photographs of Rohne

7

showed that his shorts were unbuttoned, but he did not state whether he was aware of this when he shot Rohne.

On cross examination, Appellant demonstrated how Rohne was positioned on the love seat when he woke up. Appellant confirmed that when he was awakened by Rohne's touching, he did not see a knife and had no fear of a knife. But he confirmed that when he shot Rohne, he was thinking only about Rohne and the knife. Appellant testified that "[t]he knife was the immediate danger." Appellant did not know how Rohne received the bruises on his face and arms, and maintained that he had not fought with Rohne that evening.

**Discussion**

To accept Appellant's claim of self-defense, the jury had to find that Appellant was justified under Section 9.31 of the penal code in using deadly force against Rhone, and that Appellant reasonably believed the deadly force was immediately necessary to protect him against Rhone's use or attempted use of deadly force, or to prevent Rhone's imminent commission of sexual assault. *See* TEX. PENAL CODE ANN. § 9.32(a).

Appellant testified that he shot Rohne because he "was in fear of his life and thought Rhone was going to kill him." But as the sole judge of witness credibility and the weight to be given their testimony, the jury was free to disbelieve Appellant's contention that he feared for his life. *See Saxton*, 804 S.W.2d at 914. Although Rohne had bruising on his face and arms, the living room showed no signs of struggle, and Rohne's gunshot wound showed that the weapon was discharged from an elevated position. This evidence, when viewed in light of Appellant's and Rhone's intoxication, Appellant's 911 phone calls, Rohne's mellow demeanor, the absence of prior confrontations between Rohne and Appellant, and Rohne's position on the loveseat with his ankles crossed, permits a rational jury to conclude that deadly force was not immediately necessary to protect Appellant from Rohne's alleged use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(A); *Saxton*, 804 S.W.2d at 914.

Appellant testified further that Rhone had rubbed his genitals and he thought Rhone "was going to rape" him. But Appellant contradicted his prior testimony on cross examination when he testified that he was thinking only about Rohne and the knife when he shot Rohne. This evidence permits a rational jury to conclude that it was not reasonable for Appellant to believe that deadly force was immediately necessary to prevent the imminent commission of a sexual assault. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(B),(b)(10(c); *Saxton*, 804 S.W.2d at 914.

8

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense and also found against Appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. Therefore, the evidence is sufficient to support the jury's implicit rejection of Appellant's self-defense claim. *See id.* Accordingly, we overrule Appellant's second issue.

EXCLUSION OF EVIDENCE

In his third issue, Appellant contends that the trial court abused its discretion by excluding evidence that would have corroborated his testimony. He contends that the excluded evidence proves "Rohne was an aggressive bisexual hungry to role play bizarre sexual encounters including rape, bondage, and torture."

## Standard of Review

A trial court has considerable discretion in determining whether to exclude or admit evidence. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (en banc) (op. on reh'g); *State v. Dudley*, 223 S.W.3d 717, 724 (Tex. App.—Tyler 2007, no pet.). Absent an abuse of discretion, we will not disturb a trial court's decision to admit or exclude evidence on appeal. *Dudley*, 223 S.W.3d at 724 (citing *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005)). Under this standard, we will uphold a trial court's evidentiary ruling as long as the ruling is within the "zone of reasonable disagreement." *Id.*

## Applicable Law

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence that is not relevant is inadmissible. TEX. R. EVID. 402.

In determining whether evidence is relevant, it is important that courts examine the purpose for which the evidence is being introduced. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (citations omitted). It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved. *Id.*

An alleged victim's prior specific acts of violence are admissible "only to the extent that they are relevant for a purpose other than character conformity." *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). In the context of proving the deceased was the first aggressor,

9

violent acts are relevant apart from showing character conformity by demonstrating the deceased's intent, motive, or state of mind. *Id.* Before a specific, violent act is introduced, there must be some evidence of a violent or aggressive act by the deceased that tends to raise the issue of self-defense that the specific act may explain. *Id.* at 761. Prior specific acts of violence relevant to the ultimate confrontation may be offered to show a deceased's state of mind, intent, or motive, and the specific violent acts need not be directed at the defendant to be admissible. *Id.* "As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted. . . ." *Id.* at 762.

**Discussion**

The only contested issue at trial was whether Appellant shot Rohne in self-defense. Appellant testified that Rohne was the first aggressor because Rohne rubbed Appellant's genitals, told him to relax and enjoy the pleasure, and then began to stand up from the loveseat holding a knife in his hand. The trial court excluded twenty-seven exhibits that Appellant argues would have increased the probability that Rohne (1) was an aggressive transvestite, (2) who fondled Appellant's genitals, (3) told Appellant to relax and enjoy the pleasure, and (4) whose next steps "apparently were to force or role play [Appellant's] rape with a knife (or perhaps [Appellant's] involuntary, forced rape of Rohne)."

Defense exhibits 2 through 27 are photographs of items found inside Rohne's room. The items include women's shoes, women's undergarments and other clothing, and various "sex toys." Defense exhibit 1 is a disc containing the results of a forensic search of Rohne's laptop. The disc contains several different files that include links to websites which purport to contain sexually explicit material, pornographic images of male genitalia, pornographic images of women, and pornographic images of Rohne. The pornographic images of Rohne showed him wearing women's clothing, being subjected to sexual acts with women in which he was in a submissive position, or wearing other items with his genitals exposed. There are no images contained in Defense exhibits 1 through 27 that show Rohne acting as an aggressor or engaging in homosexual conduct.

In order for Defense exhibits 1 through 27 to be admissible, they must explain the outward aggressive conduct of Rohne at the time he was shot. *Id.* at 762. The evidence at trial does not show that Rohne was wearing any of the items depicted in the proffered photographs, or

that Rohne was attempting to use any of the items on Appellant. No knives are shown to have been found in Rohne's room, and none of the images of Rohne show him engaging in homosexual activity or other activity in which a knife is being used. Accordingly, there is no direct or logical connection between these exhibits and Appellant's contention that he shot Rohne in self-defense. *See* *Layton*, 280 S.W.3d at 240.

Although the items found in Rohne's bedroom and laptop show that Rohne engaged in unorthodox sexual practices, they do not make more or less probable the fact that Appellant was in fear for his life when he shot Rohne or that he believed Rohne was going to rape him. *See id.* Moreover, Defense exhibits 1 through 27 do not demonstrate Rohne's state of mind, intent, or motive on the night of the shooting. *See* *Torres*, 71 S.W.3d at 760–62. Thus, the exhibits are not relevant apart from showing character conformity. *See* TEX. R. EVID. 401; *Torres*, 71 S.W.3d at 760. The trial court did not abuse its discretion by excluding Defense exhibits 1 through 27. *See* TEX. R. EVID. 402; *Montgomery*, 810 S.W.2d at 391. Accordingly, we overrule Appellant's third issue.

## DISPOSITION

Having overruled Appellant's second and third issues, we ***affirm*** the judgment of the trial court.

JAMES T. WORTHEN
Chief Justice

Opinion delivered December 3, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 3, 2014**

**NO. 12-13-00136-CR**

**ROBERT LYNN PRIDGEN,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 3rd District Court

of Anderson County, Texas (Tr.Ct.No. 29956)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that the decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*